**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MILTON MUSA PACHECO,

                         Plaintiff,

       - v -                                 Civ. No. 9:05-CV-998
                                               (GTS/RFT)

MARIO DE ACEVEDO, *et al.*,

                         Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

MILTON MUSA PACHECO
79-B-0064
Plaintiff, *Pro Se*
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

HON. ERIC T. SCHNEIDERMAN           C. HARRIS DAGUE, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

**I. PROCEDURAL BACKGROUND**

     The history of this case has spanned half a decade, thus, a brief recitation of some of the

salient procedural history is warranted.  On August 8, 2005, *pro se* Plaintiff Milton Pacheco initiated

this civil rights action, pursuant to 42 U.S.C. § 1983, when he filed a Complaint against fourteen

named Defendants, and several unnamed John Does, all of whom Plaintiff alleged violated his

constitutional rights.  Dkt. No. 1, Compl.  Upon granting Plaintiff permission to proceed with this

matter *in forma pauperis*, this Court directed the Marshals Service to effectuate service on the

named Defendants.  Dkt. No. 4, Order, dated Aug. 30, 2005.  After the protracted pre-trial phase

ended, which spanned two-and-one-half years, Defendants filed a Motion for Summary Judgment, Dkt. No. 98 (Defs.' Mot.), which Plaintiff opposed, Dkt. No. 104 (Pl.'s Opp'n).  On March 31, 2010, the Honorable Glenn T. Suddaby, United States District Judge, granted Defendants' Motion in part and denied it in part.  Dkt. No. 105, Dec. and Order, dated Mar. 31, 2010.  In granting the Motion, Judge Suddaby dismissed all of Plaintiff's claims, except the Eighth Amendment claims asserted against Defendants J. Rock, J. White, and Brad Fournia for allegedly forcing Plaintiff to work as a bathhouse porter despite having been medically excused from doing so by medical personnel.  These latter claims survived the Motion because, as pointed out by Judge Suddaby, though by their Motion for Summary Judgment Defendants sought dismissal of the Complaint in its entirety, Defendants failed to address therein the remaining Eighth Amendment claims against Defendants J. Rock, J. White, and Brad Fournia.  *Id*. at p. 12 & n.24.  Surmising that such omission may have resulted from oversight, Judge Suddaby provided Defendants fourteen (14) days to advise the Court whether they would seek to file a second motion for summary judgment to address those remaining claims.  *Id*. at p. 37.

Thereafter, Defendants confirmed, in writing, that their failure to address those claims in the prior Motion was inadvertent and sought thirty days to file a second motion for summary judgment. Dkt. No. 106, Defs.' Lt.-Mot., dated Apr. 12, 2010.  That request was duly granted.  Dkt. No. 107, Order, dated Apr. 13, 2010.  At that same time, Plaintiff sought permission from Judge Suddaby to file a motion for reconsideration of his Decision on Defendants' First Motion for Summary Judgment; that request was also granted.  Dkt. No. 108, Pl.'s Lt.-Mot., dated Apr. 15, 2010; Text Order, dated Apr. 15, 2010.

Plaintiff's Motion for Reconsideration was filed on May 24, 2010 (Dkt. No. 110, Pl.'s Mot.

for Recon.), which Defendants opposed (Dkt. No. 114, Defs.' Opp'n).[1] Concomitantly, Defendants' Second Motion for Summary Judgment was filed on May 26, 2010 (Dkt. No. 111, Defs.' 2d Mot. Summ. J.), which Plaintiff opposes (Dkt. Nos. 118-19, Pl's Opp'n).[2]  On August 24, 2010, Judge Suddaby granted Plaintiff's Motion for Reconsideration in part and denied it in part.  Dkt. No. 120, Dec. and Order, dated Aug. 24, 2010.  By Judge Suddaby's Order, Defendants Dale Artus and John Mitchell were reinstated as Defendants insofar as Plaintiff's Eighth Amendment claims against them related to the claims against the three other remaining Defendants. *Id*. at pp. 10-11 & 13.  In light of the reinstatement of these Defendants, Judge Suddaby provided Defendants Artus and Mitchell an opportunity to file a supplemental motion for summary judgment; in this regard, Defendants were given a deadline of September 17, 2010, to file such supplemental motion. *Id*. at p. 19.  Thereafter, upon their request, Defendants were granted an extension until October 22, 2010, to file their supplemental motion.  Dkt. No. 121, Defs.' Lt.-Mot., dated Sept. 9, 2010; Text Order, dated Sept. 10, 2010.  However, prior to the expiration of that deadline, this case was selected for the Court's *Pro Se* Prisoner Settlement Program, and the case was stayed pending the outcome of that mediation.  Dkt. No. 122, Order, dated Oct. 8, 2010.

On January 7, 2011, after mediation proved unsuccessful, the stay was lifted and this case was returned to the Court's active calendar.  Dkt. No. 124, Order, dated Jan. 7, 2011; Text Order, dated Jan. 7, 2011.  Accordingly, Judge Suddaby re-set the date for Defendants Artus and Mitchell to file a supplemental motion to February 7, 2011.  Text Order, dated Jan. 7, 2011.  On that date, Defendants sought, and were granted, another extension of time; this time their supplemental motion

---

[1] Plaintiff also filed a Reply on June 28, 2010.  Dkt. No. 117, Pl.'s Reply.

[2] This Motion is still pending and is the subject of this Report-Recommendation and Order.

was due by March 7, 2011.  Dkt. No. 125, Defs.' Lt.-Mot., dated Feb. 7, 2011; Text Order, dated Feb. 8, 2011.

To date, Defendants Artus and Mitchell have not filed a supplemental motion nor have they advised the Court and Plaintiff as to whether they join in the current Motion.  In light of this fact, and in light of the multiple extensions of time granted to accommodate these Defendants, this Court will consider the current Motion for Summary Judgment solely as to the Eighth Amendment claims against Defendants Rock, White, and Fournia.

## II.  STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant.  FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287

(2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . .  interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).  Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## III.  DISCUSSION

### A.  Material Facts

In accordance with this District's Local Rules of Practice, specifically Local Rule 7.1(a)(3), Defendants provided the Court with a statement of material facts for which they contend no genuine issue of fact exists.  Dkt. No. 111-2, Defs.' Statement Pursuant to Rule 7.1(a)(3) [hereinafter "Defs.' 7.1 Statement"].  Also in accordance with that rule, Plaintiff has opposed Defendants' 7.1 Statement with proper citations to the record to support his contentions.  Dkt. No. 119, Pl.'s Statement Pursuant to Rule 7.1(a)(3) [hereinafter "Pl.'s 7.1 Statement"].  Upon reviewing both of those documents and the supporting documentation, with abundant attention to the finite details, it is hard to imagine how Defendants can argue that no genuine issue of material fact exists entitling them to summary judgment.  Indeed, it is apparent to this Court, as set forth in more detail below, that virtually all of the genuine material facts are in dispute and the only facts that the parties agree on are those that recite the general practices of the facility, though there are instances where even those seemingly benign details are contested.[3]

In an effort to provide some background perspective, the Court extracts the following facts which Judge Suddaby, in rendering a decision on Defendants' First Motion for Summary Judgment, deemed not in dispute.[4]  "Plaintiff has been confined in the custody of the New York Department of Correctional Services ('DOCS') since 1979."  Dkt. No. 105 at p. 4.  During the time period relevant to the remaining claims in this matter, Plaintiff was confined at Clinton Correctional

---

[3] In rendering the factual recitation below, where both parties agree, the Court will only refer to Defendants' 7.1 Statement.  The Court will specifically note those instances where the parties' versions of the facts diverge.

[4] For the sake of brevity and clarity, the Court will only cite to Judge Suddaby's March 31, 2010 Decision and Order, and not the underlying citations noted therein.

Facility [hereinafter "Clinton"]. *Id.* "In or around 1998, Plaintiff was diagnosed with arthritis in both knees, upper back and other places in his body." *Id.* For years, Plaintiff's arthritis was treated with various non-steroidal anti-inflammatory drugs, such as Naprosyn. *Id.*

"On or about September 24, 2001, Plaintiff slipped and fell while 'exercising by punching the heavy bag'" in the Clinton gym, causing an injury to his right wrist. *Id.* at p. 5. Thereafter, Plaintiff received a course of medical treatment that spanned about one year; such treatment included, *inter alia*, visits with facility medical personnel, referrals to outside specialists, and x-rays.[5] *Id.* at pp. 5-10. In August 2002, Plaintiff was diagnosed with Kienböck's disease.[6] *Id.* at p. 10. Dr. R. Mitchell Rubinovich, an outside specialist, reviewed Plaintiff's x-rays and recommended either proximal row carpectomy or fusion of the wrist. *Id.* On October 9, 2002, Dr. Rubinovich operated on Plaintiff's hand and wrist. *Id.* at p. 11. "In addition to removing the lunate, which Dr. Rubinovich noted to be 'quite misshapen and deformed,' Dr. Rubinovich dissected (and removed in a 'piecemeal' fashion) the scaphoid bone, as well as the triquetrum." *Id.*

Pursuant to Clinton policy, an inmate who is unable to work due to a medical condition may qualify for issuance of a medical permit excusing him from work detail; this is known as a "no-work" permit. Defs.' 7.1 Statement at ¶ 1. Following his surgery, and upon his release from the facility hospital, Plaintiff was given a "no-work" permit for a three-week period. *Id.* at ¶ 9. At that time, he was housed on the B-Block and assigned the job of a bathhouse porter. *Id.* at ¶ 13; Pl.'s 7.1

---

[5] The Court need not recite the medical treatment Pacheco received during these years nor his relative Eighth Amendment claims, as such were the focus of Judge Suddaby's prior decision and none of those Defendants implicated in any alleged constitutional wrongdoing remain in this lawsuit.

[6] Kienböck's disease is the "slowly progressive osteochondrosis [or degeneration] of the semilunar (carpal lunate) bone; it may affect other bones of the wrist." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 484 & 1200 (28th ed. 1994).

Statement at ¶¶ 13 & 13-a.[7]

On October 22, 2002, Plaintiff returned to the medical unit to discuss his no-work permit.
Defs.' 7.1 Statement at ¶ 10.  While Defendants claim that Plaintiff was there simply to "renew" his
no-work permit (which technically would not have expired yet), Plaintiff asserts that during this
visit, he informed Mary Nisoff, R.N., that Officers J. Rock, J. White, B. Fournia, and others were
pressuring him to return to his job a bathhouse porter.  Pl.'s 7.1 Statement at ¶ 10-a.  Nurse Nisoff
issued Plaintiff a no-work permit, which stated it was to last "indefinitely."  Defs.' 7.1 Statement
at ¶ 11.  Both parties have provided copies of that pass and Plaintiff has also provided an excerpt
from his Ambulatory Health Record (AHR) for that date.  Dkt. No. 119-2, Milton Pacheco Affirm.,
dated July 13, 2010, Exs. 1 & 2 (docketed as Dkt. No. 119-1 at pp. 1-5); Dkt. No. 111-6, Brian
Lecuyer Aff., dated May 26, 2010, Ex. A.  This particular permit is produced in triplicate, with one
copy remaining in the medical file, one copy designated for the inmate, and another copy to be
provided to the inmate's housing unit.  Defs.' 7.1 Statement at ¶¶ 2-3 (noting only that the third copy
is "sent to the inmate's housing unit"); Pl.'s 7.1 Statement at ¶¶ 3-a & 4-a (noting that two copies
can be provided to the inmate who is charged with the task of delivering it to the block officer, or
a copy can be sent to the block through internal mail); Dkt. No. 111-8, Joseph M. Rock Aff., dated
May 24, 2010, at ¶ 9 (noting that a no-work permit can be provided to the block officer by the

---

[7] In support of their assertion of this fact, Defendants provide Plaintiff's DOCS' Movement History Form.  Dkt.
No. 111-4, C. Harris Dague, Esq., Decl., dated Mar. 25, 2010, Ex. 7 (docketed as Dkt. No. 111-5 at pp. 70-72).  All
references to Attorney Dague's Exhibits will be to the numbering assigned by the Court's electronic docketing system.
Plaintiff declines to admit Defendants' factual assertion in paragraph thirteen because he feels that the source provided
for that statement is incomplete.  Pl.'s 7.1 Statement at ¶ 13-a.  We agree with Plaintiff's assessment insofar as the dates
relevant to the claims herein seem to be missing from this form, and we further note that this form is difficult to decipher,
thus, the relevance, or rather, helpfulness, of this document eludes the Court.  Plaintiff provides the Court with a clearer
document, entitled "Inmate Program Assignment," which shows that from October 7, 2002 through February 2, 2003,
Plaintiff was assigned to work as a porter in the shop bathhouse.  Dkt. No. 119-2, Milton Pacheco Affirm., dated July
13, 2010, Ex. 4 (docketed as Dkt. No. 119-1 at pp. 10-11).  All references to Plaintiff's Exhibits will be to the page
numbering assigned by the Court's electronic docketing system.

inmate or it can be sent to the block *via* internal facility mail from the medical department).  Plaintiff asserts that on that date, Nurse Nisoff gave Plaintiff two copies of the no-work permit and instructed him to deliver one to the housing unit officer.  Pl.' 7.1 Statement at ¶ 10-a.  Despite Defendants' contention that there exists "no evidence" that the October 22nd no-work permit was ever "sent" to Plaintiff's housing unit, Plaintiff asserts that upon his return to his housing unit on October 22, 2002, he personally delivered the permit to the block officer.  Defs.' 7.1 Statement at ¶ 12; Pl.'s 7.1 Statement at ¶¶ 12-a & 12-b.  When a no-work permit is received on B-Block, it is supposed to be hung on a clip at the block officers' desk.  Rock Aff. at ¶ 10.  If an inmate claims that he has a medical permit, but cannot provide a copy to the block officer, the officer may call medical to confirm whether the inmate actually has a no-work permit.  Defs.' 7.1 Statement at ¶ 6.

On December 18, 2002, Plaintiff wrote a letter to Deputy Superintendent Dale Artus. Pacheco Affirm., Ex. 5 (docketed as Dkt. No. 119-1 at pp. 12-13); Dague Decl., Ex. 1 (docketed at Dkt. No. 111-5 at p. 7).  Within that letter, Plaintiff references a conversation he had, in person, with Defendant Artus and further complains about officers on his block that are "rushing" him to go back to work despite him having Nurse Nisoff's no-work permit.  Plaintiff notes in that letter that he did not want to lose his job as a porter nor be issued a misbehavior report for refusing a work/program. He also notes that he requested an appointment with a doctor to discuss this matter further and so his medical record could be better "establish[ed]" in the event he is forced to work and risk further injury to his hand/wrist.  By Interdepartmental Communication, dated December 19, 2002, Defendant Artus informed Plaintiff that his letter was being referred to Defendant John Mitchell, Nurse Administrator, for review and response.  Dague Decl., Ex. 1 (docketed as Dkt. No. 111-5 at p. 6).  On December 30, 2002, Defendant Mitchell sent an Interdepartmental Communication to

Plaintiff which stated: "No work until you are cleared by Dr. Rubinovich." *Id.* (docketed at Dkt. No. 111-5 at p. 2).

From October 22nd until December 23rd, Plaintiff was not forced to work as a bathhouse porter. Pl.'s 7.1 Statement at ¶ 12-c. Plaintiff asserts, however, that from December 24, 2002 through January 24, 2003, Defendants Rock, White, and Fournia forced him to return to his job as the B-Block evening bathhouse porter. Defs.' 7.1 Statement at ¶ 17. Plaintiff claims that each time he was forced to work, he personally showed the Defendants his copy of his no-work permit, to which Defendants stated they did not care. Pl.'s 7.1 Statement at ¶¶ 12-d through 12-i. Plaintiff further asserts that as a result of being forced to work during the month at issue, he suffered "excruciating pain" in performing the porter work detail that required him to do the following:

> fill large buckets of water and lift them to and from the slop sink [some of these buckets filled with water weighed approx. 30 to 35 pounds]. Plaintiff was ordered to mop the floor, from side to side in a wide arch across the bathhouse floor. Plaintiff was ordered to scrub the floor and walls of the bathhouse with scrub brushes. Plaintiff was ordered to unwind a lengthy hose for 'general clean-up' in the bathhouse, then to wind up the hose to store it. Plaintiff was ordered to carry large buckets, filled with water, to and from the office [these buckets weigh approx. 30 to 35 pounds].

Pacheco Affirm. at ¶ O.[8]

## B. Eighth Amendment

Plaintiff asserts that Defendants Rock, White, and Fournia violated his Eighth Amendment rights when they forced him to return to his job as a bathhouse porter despite being informed of his valid medical permit and despite being informed by him of his physical inability to perform such

---

[8] Midway through his affirmation, Plaintiff changes the numerical numbering of his paragraphs to alphabetical assignments.

work without enduring excruciating pain.[9]

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 & 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

To establish an Eighth Amendment claim based on unsafe or medically inappropriate working conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer v. Brennan*, 511 U.S. at 834. Plaintiff's claim may also be analogized to a claim for inadequate medical care, which similarly requires proof of deliberate indifference. *See, e.g., Gill v. Mooney*, 824 F.2d 192, 195-96 (2d Cir. 1987) (finding that the prisoner alleged an Eighth Amendment medical claim when he alleged that prison guards deliberately ignored doctor's order that prisoner pursue exercise in prison gym); *Atkinson v. Fischer*, 2009 WL 3165544, at *11 (N.D.N.Y. Sept. 25, 2009) (applying Eighth Amendment standards for medical care in analyzing claim that plaintiff was assigned to a prison job that was inappropriate,

---

[9] In his verified Complaint, Plaintiff suggests that the reason these Defendants forced him to work was to retaliate against Plaintiff for his exercise of his First Amendment right to file grievances and pursue other civil lawsuits. Dkt. No. 1, Compl. at ¶ 1. However, as Judge Suddaby previously noted, "a close examination of the entire Complaint reveals that the seven causes of action set forth in the Complaint arise exclusively under the Eighth Amendment." Dkt. No. 105 at p. 2 n.2. During the pendency of this litigation, Plaintiff has not presented the Defendants nor the Court with any underlying facts to support his retaliation allegation, if indeed it can be read as an allegation as opposed being conclusory. Furthermore, even if such facts were presented at this stage, we are bound to follow the law of the case as established by Judge Suddaby and are simply not at liberty to allow the interjection of a new cause of action into this lawsuit. *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) (quoting *Dilaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992), for the proposition that the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

given his medical condition).

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d at 66. Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Id.* (quoting *Wilson v. Seiter*, 501 U.S. at 298). An inmate may satisfy the objective prong by alleging that his prison work duties created a substantial risk of serious injury or harm. *Howard v. Headly*, 72 F. Supp. 2d 118, 123-24 (E.D.N.Y. 1999) (collecting cases). The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer v. Brennan*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway v. Coughlin*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

With regard to the objective prong, relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: 1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; 2) the presence of a medical condition that significantly affects an individual's daily activities; and 3) the existence of chronic and substantial pain. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citation omitted). As with the prior Motion, Defendants concede for purposes of the pending Motion that the diagnosis of Kienböck's disease constitutes a serious medical need.

Dkt. No. 111-3, Defs.' Mem. of Law, at p. 12.  But, we would take that one step further and find, as a matter of law, that during the time in question, Plaintiff's post-surgery condition also constituted a serious medical condition.  A plaintiff may satisfy the objective prong by alleging that his prison work duties created a serious risk of serious injury.  *Baumann v. Walsh*, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) (prisoner alleged Eighth Amendment claim when he alleged that he had been required to climb along top shelf of storage room); *Thomas v. Coombe*, 1998 WL 20000, at *2 (S.D.N.Y. Jan. 20, 1998) (prisoner set forth Eighth Amendment claim when she alleged that she had been required to perform heavy kitchen work in contravention of doctor's orders).  Plaintiff's hand and wrist surgery was performed on October 9, 2002. Dkt. No. 105 at p. 11.  Following the surgery, he was deemed ineligible to perform work.  On October 31, 2002, Dr. Rubinovich removed the cast and reported satisfactory review of the x-rays taken that date and satisfactory movement of Plaintiff's fingers; he recommended that Plaintiff begin physical therapy.  *Id*.  From November 26, 2002 through January 15, 2003, Plaintiff attended thirteen (13) sessions of physical therapy.  *Id*. at n.21.  At a follow-up visit with Dr. Rubinovich on December 26, 2002, Plaintiff was noted to be improving and his range of motion was not painful, although Plaintiff reported some weakness.  *Id*. at p. 11.

Thus, it appears from previously established facts that Plaintiff's post-surgery condition was one in which medical personnel felt was worthy of comment and treatment; his post-surgery condition affected his daily activities, necessitating an initial and subsequent excuse from work; and Plaintiff obtained numerous physical therapy sessions to improve his strength.  And, portions of the record submitted by both parties establish that Plaintiff was deemed medically unable to work.  It stands to reason that a premature return to work could imperil his recovery and cause pain.  Thus,

Plaintiff has established the first prong of his Eighth Amendment claims.

However, the establishment of a serious medical condition is but one part of the analysis. It must also be established that Plaintiff was subjected to conditions that posed a risk to his health and/or safety, and that the Defendants imposing such conditions did so with deliberate indifference. It is precisely these two factors that the Court finds are genuinely at issue and cannot be resolved by summary judgment. Defendants have propounded several reasons for which they feel entitle them to summary judgment. The Court will address each of Defendants' contentions below.

Defendants first argue that both White and Fournia were not present during the times when Plaintiff was allegedly forced to work. Defs.' Mem. of Law at pp. 8-9. Defendants explain, and Plaintiff does not contest, that Clinton runs on a three-shift rotation for its correction officers: First shift is from 11 p.m. to 7 a.m.; second shift is from 7 a.m. to 3 p.m.; and, third shift is from 3 p.m. to 11 p.m. Rock Aff. at ¶ 5. Defendants state that Plaintiff was assigned as an evening bathhouse porter, as established by Plaintiff's Movement History, and that the callout time for such evening work detail is approximately 6 p.m. each day, which falls into the third shift. Dague Decl., Ex. 7 (docketed as Dkt. No. 111-5 at pp. 70-72);[10] Rock Aff. at ¶ 7. Defendant White avows that during the time period in question, he was working as the first officer on B-Block during the second shift, that is, the 7 a.m. to 3 p.m. shift. Dkt. No. 111-10, Jeffrey S. White Aff., dated May 25, 2010, at ¶ 4. Defendant Fournia avows that during the time period in question, he was working as a relief officer not assigned to any particular block and only worked one day in B-Block, on January 13, 2003, during the second shift. Dkt. No. 111-11, Brad Fournia Aff., dated May 25, 2010, at ¶¶ 4 & 7. Thus, it is Defendants' aligned theory that the record "demonstrates" that because evening work

---

[10] While we previously noted the lack of clarity with this document, Plaintiff does not contest that he was assigned the job of an evening bathhouse porter. *See supra* note 7.

detail occurs during the third shift, and because White and Fournia worked the second shift, they were not present when Plaintiff would have been sent to his job. *See* Defs.' Mem. of Law at p. 8. However, all three Defendants admit that it is conceivable that an evening porter may be called out to his job earlier than 6 p.m., and to their knowledge, there is no record-keeping when this occurs. Rock Aff. at ¶ 7; White Aff. at ¶ 9; Fournia Aff. at ¶ 8.  While it is somewhat astonishing to this Court that there would be no record made of an inmate being released from his cell at an earlier time, after reviewing the illegible and utterly incomplete records maintained at B-Block, the Court has little reason to doubt the veracity of these officers' statements.

The problem, however, is that Plaintiff has never been under the mistaken impression that these officers worked a different shift, like the evening shift,[11] and has been rather consistent with his claims that these officers were, for lack of a better term, bullying him into prematurely going back to work and then forcing him to work, despite his protestations to the contrary, at times earlier than the evening callout.  Plaintiff explains that there were approximately five inmates assigned to the evening porter job and that each inmate worked five days a week, with two days off. Pacheco Affirm. at ¶ 14-a.  He concedes that generally, these inmates reported to work at approximately 5:30 p.m. or 6:00 p.m., however, during "holiday" schedules (such as Christmas and New Years), the porters were ordered to work at 2:30 p.m. *Id.*  Not only does Plaintiff assert these allegations in a verified Affirmation, but he also submits the verified Affidavits of his fellow inmates who were also assigned as bathhouse porters. *Id.*, Ex. 15, Anthony Gega Affirm., dated Oct. 21, 2004, at ¶¶ 4, 5, 12 (docketed as Dkt. No. 119-1 at pp. 56-58); Ex. 17, John Malachi Aff., dated Nov. 2, 2004, at ¶¶

---

[11] In his verified Complaint, Plaintiff identifies Defendant White as "a Prison guard, and assigned to the 'B-block' unit morning shift at Clinton during the relevant periods described herein" and identifies Defendant Fournia as "a Prison guard, and assigned to the 'B-block' Unit morning shift at Clinton during the relevant periods described herein."  Compl. at ¶¶ 13 & 14.

*-15-*

4, 5 & 16 (docketed as Dkt. No. 119-1 at pp. 77 & 79).

In moving for summary judgment, it is Defendants' burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  This they have not achieved.  By their Affidavits, Defendants White and Fournia do not establish that they did not order Plaintiff to work despite being shown a no-work pass.  In fact, their entire basis for summary judgment lies in their flawed theory that because they were not present during the third shift, they did not order Plaintiff to work.  But, in these very same Affidavits, they concede that an inmate assigned for evening work detail could be called out earlier and that there would be no documentation of this.  For Defendants to state that there is "no evidence to suggest that [Pacheco] was sent to his job before 6PM at any time during the month in question" is disingenuous in light of their explicit admissions that such scenario is both possible and not documented.  Defs.' Mem. of Law at p. 9.  To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(c).  Plaintiff has achieved this by pointing out the inconsistencies in Defendants' arguments and through the submission of several sworn statements.  To that end, these sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d 282, 289 (2d Cir. 2003) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) & *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

*-16-*

Construing all ambiguities, as we must, in favor of the non-movant, we find that Defendants White and Fournia have not established entitlement to summary judgment based on their work schedule and such request should be **denied**.

Defendants' next argument is similarly perplexing, and also internally inconsistent. It seems that Defendants' argument begins with the proposition that they cannot be held liable because the "record is clear that Defendants were not aware that [Pacheco] had a valid 'no work' permit during the period in question." Defs.' Mem. of Law at p. 10. The Court notes that the record is far from clear on this issue. Defendants seem to make much of the term "valid" when describing the absence of a no-work permit. Candidly, the Court is unsure of the precise contours of this argument. Ostensibly, Defendants assert that Plaintiff simply did not have a "valid no-work permit," or perhaps he did not possess a "valid" permit in that it wasn't on file with the block officer, or, that the Defendants were simply "unaware" of the existence of a "valid" permit. While they fall short of articulating their theories and facts in these precise terms, in support of their quest for summary judgment, Defendants provide three modes of attack.

First, Defendants point to the multiple letters and grievances Plaintiff wrote to various prison personnel wherein, according to Defendants' reading of such documents, he "repeatedly stated that he was not issued a 'no-work' permit during the period in question. *Id.* According to Defendants' hypothesis, Plaintiff must not have possessed a valid no-work permit, or else why would he consistently write letters seeking one? This theory is utterly disingenuous and constitutes a blatant disregard for the entirety of what those documents state. First, no one seriously contests that Nurse Nisoff gave Plaintiff a no-work permit on October 22nd that was to be in effect indefinitely. Defendants and Plaintiff each provide the Court with a copy of that permit, and Defendants do not

contest its authenticity or that it was readily at their disposal for verification upon contacting the

medical department.  As for the multiple letters and grievances cited by Defendants, each one of

those letters authored by Plaintiff complain about the Defendants ignoring Plaintiff's no-work

permit.  For example, in the letter Plaintiff wrote to Defendant Artus, Plaintiff complained that the

Defendants were rushing him to go back to work despite his medical excuse.  Dague Decl., Ex. 1

(docketed as Dkt. No. 111-5 at p. 7).   In making their arguments to the Court, Defendants

conveniently omit the resolution of that letter, which was an unequivocal statement from Defendant

Mitchell stating Plaintiff would not have to work until cleared by Dr. Rubinovich.  *Id.* (docketed as

Dkt. No. 111-5 at p. 2).   According to Plaintiff's other letters, Plaintiff complained that Defendant

Mitchell failed to provide Plaintiff with another permit so that he could definitively squelch the

Defendants' abuse.  All of the inmate grievances Defendants cite to deal with that very issue (as well

as an issue regarding a forged permit discussed below).  A full reading of these documents do not

lead this Court to believe that Plaintiff did not possess a valid permit, but rather that, from Plaintiff's

perspective, the Defendants ignored the permit he consistently showed them and he sought another

permit in order to stop the harassment and abuse.  *See id.*, Exs. 2-6 (docketed as Dkt. No. 111-5 at

pp. 9-69).

    Second, parsing words even further, none of the Defendants outright deny that Plaintiff ever

showed them a "valid no-work permit."  Instead, Defendant White states he does "not recall" being

shown one, while Defendant Fournia does "not recall" releasing Plaintiff for work early on the date

he worked on B-Block.  White Aff. at ¶ 10; Fournia Aff. at ¶ 8.  And Defendant Rock provides

virtually no personal knowledge of this issue and instead utilizes vague and hypothetical language,

such as "If Plaintiff had a valid 'no work' permit on file at the B-Block officers' desk covering the

dates in question, I would have excused him from his work detail." Rock Aff. at ¶ 16. That's a far cry from stating definitively that Plaintiff never showed him a no-work permit. Defendant Rock goes even further by suggesting that Plaintiff could simply have refused to go to work, receive a misbehavior report, and then produce his no-work permit to the hearing officer. *Id*. at ¶¶ 13 & 14.[12] In essence, Rock avows that Pacheco would have been free to deliberately disobey a direct order from a correction officer; a circumstance we all know not to be the case. Not only would Pacheco have risked the wrath of a correction officer in failing to obey a direct order, but he also would run the risk of being punished for doing so. These arguments hardly show an entitlement to summary judgment.

Lastly, in support of their inference that no "valid" no-work permit was in effect, or on file with the block officer, Defendants point the Court to an incident that occurred on January 13, 2003, wherein Defendant Fourina claims he caught Plaintiff with a forged no-work permit. According to Fournia, though he could not recall releasing Plaintiff from his cell to report to his evening porter job on January 13th, he recalls an incident whereby Plaintiff "submitt[ed]" a forged no-work permit to an officer on B-Block. Fournia Aff. at ¶ 9. Fournia became suspicious of the document, which bore the signature of Defendant Mitchell, and contacted Defendant Mitchell to confirm the authenticity of the signature. *Id*. Upon reviewing the document, Defendant Mitchell deemed it a forgery and issued Plaintiff a misbehavior report charging Plaintiff with violating prison rules 116.2 (inmate shall not alter or forge or counterfeit) and 113.11 (inmate shall not possess or alter or change document). *Id.*, Ex. A. At the conclusion of a Tier III Disciplinary Hearing, Plaintiff was found not

---

[12] As noted below, when Pacheco received a misbehavior report for producing a forged no-work permit, the hearing officer was presented with evidence that Plaintiff was on medical no-work status, and yet, he still received significant punishment.

guilty of violating rule 113.11, but guilty of violating rule 116.2, and received ninety (90) days in a special housing unit (SHU) with corresponding loss of privileges and a recommendation of three months loss of good time.  *Id.*  Based on this disciplinary finding, Defendants would like the Court to draw the conclusion that Plaintiff must not have had a valid no-work permit, or why else would he forge one?  But the opposite conclusion may hold true: Why would Plaintiff need to forge a medical permit when he's proclaimed all along to have a valid one issued by Nurse Nisoff?  Indeed, this was Plaintiff's defense during the disciplinary hearing, along with his insistence that no one established that he actually produced that document to anyone.  Pacheco Affirm., Ex. 9 (docketed as Dkt. No. 119-1 at pp. 22-35).  Interestingly, in the misbehavior report, Defendant Mitchell states that after being contacted by the B-Block officer, Mitchell checked Pacheco's medical records and confirmed that he did not have an excuse permit.  Fourina Aff., Ex. A.  However, during the disciplinary hearing, Mitchell testified that he re-reviewed Pacheco's medical record and confirmed that he was on no-work status in light of Nurse Nisoff's issuance of a medical permit stating no work indefinitely.  Pacheco Affirm., Ex. 9 (docketed as Dkt. No. 119-1 at pp. 31-32).

Far from settling these issues as a matter of law, each of the Defendants' grounds for dismissal have only perpetuated more questions of material fact that cannot be resolved by the Court.  A fact is material when "it might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoted in *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).  Further, an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted).

In sum, Defendants' argument that they were simply unaware of a valid no-work permit because one was not on file with the block officer is belied by Defendant Rock's testimony that he, and the other Defendants, when faced with Plaintiff's protestations, could have called medical to confirm the existence of his no-work status in light of both Nurse Nisoff's October 22nd medical permit and Nurse Mitchell's December 30th statement.  Defendants do not contest the existence of these documents, and it appears that a simple review of Plaintiff's medical record would have confirmed this.  Plaintiff maintains, under penalty of perjury, that he showed his copy of the permit to the Defendants, which they blatantly disregarded.  He supplies the Affidavits of other inmate workers who corroborate many of his statements.  He also submits plenty of evidence poking holes in the Defendants' theories of non-liability.  It is more proper for a jury to determine whether, in fact, Plaintiff showed Defendants his medical pass and whether they disregarded it and forced him to work.  If the jury were to find that the facts occurred as Plaintiff claims them to be, then it cannot be denied that Defendants placed Plaintiff in a position that seriously endangered his health and possible safety with deliberate indifference.

For all of the reasons stated above, the Defendants are not entitled to summary judgment and their Motion should be **denied**.

### C.  Qualified Immunity

Lastly, Defendants contend they are entitled to qualified immunity.  The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d

889, 895 (2d Cir. 1988).[13]

Whether an official protected by qualified immunity may be held liable for alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999).

At the time these events allegedly took place, it was clearly established that prisoners have the right to be free from cruel and unusual punishment, or, more specifically, the right to be confined under safe conditions and not be forced to work if doing so posed a risk to the inmates safety. *See Gill v. Mooney*, 824 F.2d 192 (2d Cir. 1987) (finding plaintiff alleged an Eighth Amendment violation where he fell off a ladder while working and, despite complaining to the officer about the unsafe working condition, was forced to continue enduring such conditions).

Additionally, the Court must consider whether the Defendants' actions were objectively reasonable. It is not entirely clear to this Court how Defendants can maintain such an argument, especially in light of the various and sometimes inconsistent theories of non-liability. In essence, it is more proper to view Defendants' arguments as a total defense from liability based on their apparent lack of knowledge of the existence of a no-work permit. In the event a jury finds that they were not aware of such a permit, then there conceivably would be no basis for liability. In such instance, qualified immunity is not necessary. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no

---

[13] Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz*, 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 at 201-02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier*. *See Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").  On the other hand, if Plaintiff establishes at trial that he showed Defendants his pass, or even alerted them to the possibility that he is excused from work, and they ignored such information and forced him to work under such conditions, such actions could not be deemed as acting reasonably in light of clearly established law.  Thus, in light of what has been presented, we find that the Defendants are not entitled to the qualified immunity defense.

## IV.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Second Motion for Summary Judgment (Dkt. No. 111) be **DENIED** and this case be deemed trial ready as to Plaintiff's Eighth Amendment "Return to Work" claims against Defendants John Mitchell, Dale Artus, Brad Fournia, J. Rock, and J. White. In the event this recommendation is adopted, this Court is prepared, upon such adoption, to hold a final pre-trial conference with the parties; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   March 31, 2011
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge